IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:12-CR-114 |
| | ) | |
| JAMES ROBINSON, | ) | (PHILLIPS / GUYTON) |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Judge as may be appropriate. This case came before the Court on November 13, 2012, for an evidentiary hearing on the Defendant's Motion to Suppress [Doc. 21]. Assistant United States Attorney Cynthia F. Davidson appeared on behalf of the Government. Attorney John E. Eldridge represented the Defendant, who was also present. The parties presented evidence and argument on the motion. At the conclusion of the hearing, defense counsel asked to file a post-hearing brief. The Court granted the request and set deadlines for the Defendant's brief and the Government's responding brief. On November 19, 2012, the Defendant filed a supplemental brief [Doc. 33]. The Government made no additional filing. The Court took the matter under advisement on November 29, 2012.

**I. POSITIONS OF THE PARTIES**

Defendant Robinson was a passenger in a car that Anderson County Sheriff's deputies

1

stopped and subsequently searched on April 20, 2012. He stands charged [Doc. 1], along with Codefendant James Coker, of being a felon in possession of a firearm on that day. The Defendant asks [Docs. 21 and 33] the Court to suppress the fruits of that search, including evidence seized from the car and firearms found at another location. He argues that the occupants of the car were illegally seized and illegally detained in excess of the time necessary to complete the traffic stop and consensual search of the vehicle. He contends that the statements of the other occupants of the car and the firearms ultimately taken as a result of their statements must be suppressed as the fruits of the unconstitutional seizure.

The Government responds [Doc. 27] that the car was properly stopped for speeding. It also argues that the Defendant's detention was not unreasonably prolonged because the officer reasonably suspected that he was involved in a burglary. The Government asserts that the detention of the car's occupants lasted only long enough for the officer to confirm or dispel his suspicions about the burglary by minimally intrusive means. Finally, the Government asserts that even if the Court finds that the officers exceeded the purpose of the traffic stop, it should not suppress the evidence in this case because the officers acted in good faith.

## II. SUMMARY OF TESTIMONY

The Government called Deputy Wally Braden, who testified that he had served as a deputy with the Anderson County Sheriff's Department for four years. On April 20, 2012, he was conducting traffic enforcement on Norris Freeway, which he characterized as being located in a high crime area. He stated that numerous residential burglaries had occurred in that area around that time. At 2:42 p.m., Deputy Braden stopped a red Toyota Celica, which was traveling at sixty-three (63)

2

miles per hour in a fifty mile-per-hour zone. Rebecca Hill was driving the car, the Defendant Robinson was the front passenger, and James Coker, a codefendant in this case, was a rear passenger. Deputy Braden recognized the three occupants, because all three had been arrested on several prior occasions for burglary or theft. When Deputy Braden walked up to the window and spoke with Ms. Hill, he saw a big-screen television on the backseat beside Coker. Deputy Braden testified that when he asked the occupants of the car about the television, they seemed nervous and evasive. The Defendant said the television belonged to Coker, who agreed that it was his.

Deputy Braden stated that he called for a back-up officer and that a K-9 unit arrived within two minutes. The K-9 officer, Deputy Coley, walked his police dog around the Celica and then told Deputy Braden that the dog had alerted on the car. Deputy Braden told the driver Ms. Hill that the police dog had alerted on her car. Deputy Braden testified that Ms. Hill responded that "they" had smoked marijuana in the car the previous evening but that no drugs were presently in the car. Deputy Braden requested Ms. Hill's consent to search the Celica. Deputy Braden said that Ms. Hill gave him consent to search the car. The occupants were asked to get out of the car and advised of the Miranda warnings. They stated that they understood the warnings. Deputy Braden then searched the car and found black gloves in the glove box and an earring in the back floorboard. The search took twenty to twenty-five minutes. Deputy Braden said at that point, he was investigating a possible theft because of the black gloves, the earring, and the television, along with the nervousness of the occupants.

Deputy Braden testified that at 3:20 p.m., he heard a radio dispatch about a residential burglary at 2514 Hinds Creek Road. He said that he immediately contacted the dispatcher and learned that an RCA television, guns, and jewelry had been taken in that burglary. Six to seven

3

minutes after the initial dispatch of the burglary, Deputy Braden called the officer responding to the Hinds Creek residence and got the serial number of the stolen television. The serial number from the stolen television matched the serial number of the television in the Celica. The Defendant and Coker were arrested once Deputy Braden confirmed that the serial numbers matched.

Deputy Braden stated that Ms. Hill then gave a statement saying they had taken the stolen firearms to her house. Coker also gave a statement later that day. Deputy Braden testified that although his in-car camera recorded the stop and he asked the technician to download the video, the video had been lost and was not available. Deputy Braden explained that his in-car camera was new and that the Anderson County Sheriff's Department did not have a database set up at that time for the in-car video footage.

On cross-examination, Deputy Braden testified that on April 20, 2012, he was traveling south on Norris Freeway and passed a red Celica traveling north at sixty-three (63) miles per hour. He stated that he knew the car was exceeding the speed limit on sight and that he confirmed the speed with his in-car radar unit. Deputy Braden testified that traffic was not heavy at that time and that no other cars were in the area. He agreed that his radar reading was the only information that he had about the Celica and that he did not have a printout or other documentation of the radar reading.

Deputy Braden stated that he recognized Hill when he spoke to her at the window of the Celica. The Defendant was still seated in the car, when he told Deputy Braden that the television belonged to Coker. Deputy Braden said that he could tell that the Defendant was nervous and characterized him as evasive, although he could not remember what the Defendant said that gave him that impression. Deputy Braden initially said that he could not recall the mannerisms that made the

Defendant seem nervous but then testified that the Defendant's hands were shaking.

Deputy Braden testified that he stopped the Celica at 2:42 p.m. and that Deputy Jeff Davis, a supervising officer, arrived at 2:44 p.m. Deputy Braden stated that Deputy Rick Coley, the K-9 officer, arrived at 2:47 p.m. and walked his police dog around the Celica. The dog "hit" on the car, and Deputy Braden told Hill about the hit. Hill told him that marijuana had been smoked in the car the previous day but that there was "nothing" in it at the time. She told him that he could search the car, and Deputy Braden asked the occupants to step out. He had the occupants stand apart from each other with Hill standing in front of the Celica, Defendant Robinson standing in front of his police car and behind the Celica, and Coker standing behind his police car. Deputy Braden agreed that in addition to the television, which he had seen in the car when he first approached, he found only black gloves in the glove box and an earring on the floorboard. He said that Deputy Coley began searching the car around 2:50 p.m., that the search took twenty to twenty-five minutes, and that the search included the trunk of the Celica. He said that he did not recall that he or Deputy Coley removed the seats from the car during the search or removed the carpet in the trunk. During the search, the Defendant was either sitting on the bumper of the police car or standing in front of it.

Deputy Braden testified about the report of Deputy Relford, the officer who responded to the burglary at 2514 Hinds Creek Road. The report reflects that the dispatcher placed the call about the burglary at 3:20 p.m. and that Deputy Relford arrived at the residence at 3:29 p.m. Deputy Relford then spoke with the homeowner Marie Kidwell. Deputy Braden testified that as soon as he heard the initial dispatch about the burglary, he called the dispatcher and asked what items were taken from the residence.

5

Deputy Braden next testified about an Anderson County Sheriff's Department Complaint Card relating to the traffic stop of the Celica on April 20, 2012. The Complaint Card reflects that Deputy Davis arrived at 2:44 p.m. and Deputy Coley arrived at 2:47 p.m. The Complaint Card also shows that dispatch notified Deputy Braden that the occupants of the Celica had no outstanding warrants in Anderson, Knox, or Union Counties. The Complaint Card states that at 3:21 p.m., a female police officer was en route from Anderson County High School to search Hill. At 3:21, Deputy Braden reported the serial number of the television in the Celica to the dispatcher, who informed him that there was no report of a television with that serial number having been stolen. Deputy Braden agreed that nothing on the Complaint Card connected the television in the Celica to the burglary at 2514 Hinds Creek Road. He stated that although he immediately called the dispatcher following the radio dispatch of the burglary, the Complaint Card does not show this call or that the dispatcher told him a television had been stolen. He said this information was not on the Complaint Card because sometimes the dispatcher does not record items if he or she is busy. Deputy Braden stated that he did not confirm that the television in the Celica was the one taken from 2514 Hinds Creek Road until after Deputy Relford arrived at the residence, spoke with Ms. Kidwell, and got the serial number from her. Deputy Braden agreed that the confirmation may have occurred around 3:35 p.m.

Deputy Braden acknowledged that the Celica was searched around 2:50 p.m. and that the search was completed by 3:15 p.m. Deputy Braden said that during the fifteen to twenty minutes between completing the search of the Celica and confirming that the serial number of the television matched that of the one stolen, he was continuing to investigate the possible theft of the television. Deputy Braden said that although Coker claimed that the television was his, Coker's explanation

6

aroused his suspicions. Coker told Deputy Braden that he and his girlfriend had broken up and that he was moving out and taking his television. Deputy Braden wondered why Coker did not have any clothes or other belongings aside from the television, if he was moving. Deputy Braden said that he attempted to call Coker's ex-girlfriend but did not reach her until after the dispatch about the burglary at 2514 Hinds Creek Road. Deputy Braden agreed that this dispatch, which occurred at 3:21 p.m., did not state that a television had been stolen.

On redirect examination, Deputy Braden testified that after the stop, he checked to learn whether any of the occupants of the car had outstanding warrants. He testified about the Anderson County Sheriff's Department Complaint Card relating to the burglary of the residence at 2514 Hinds Creek Road. This Complaint Card was prepared by Deputy Relford. The burglary Complaint Card states that the dispatch of the burglary was at 3:18 p.m. It states that at 3:29 p.m., dispatch received information that the following items were stolen from the residence: a thirty-two inch, flat screen, RCA television; a gold chain necklace, and a revolver. Deputy Braden testified that the dispatcher had already given him this information before it was entered on the dispatch log at 3:29 p.m. The Complaint Card also shows that Deputy Relford arrived at the residence at 3:29 p.m. Deputy Braden testified that none of the occupants of the Celica recognized the earring or provided any explanation for the black gloves. Deputy Braden stated that Coker "stumbled over himself" when asked about the television and his moving from the residence he had shared with his girlfriend. Deputy Braden said that the Celica did not contain any clothing or luggage. He said that he was suspicious that the television had been stolen and that he confirmed that suspicion at 3:29 p.m.

On re-cross-examination, Deputy Braden stated that after confirming that the television was stolen, he talked with Hill about the guns taken from the Hinds Creek residence. He

7

said that Hill admitted that she knew where the guns were and led him to her mother's house, where the guns were ultimately recovered. Deputy Braden acknowledged that the stolen guns were not in the Celica and that he did not have any information to lead him to the location of the guns until after he arrested the Defendant, Hill, and Coker for burglary.

### III. FINDINGS OF FACT

The Court makes the following factual findings based upon Deputy Braden's testimony: On the afternoon of April 20, 2012, Anderson County Sheriff's Deputy Wally Braden was patroling on Norris Freeway near an area that had recently experienced a number of residential burglaries. Deputy Braden passed a red Toyota Celica going in the opposite direction and believed that the car was speeding. His radar measured the Celica as traveling sixty-three miles per hour in a fifty mile-per-hour zone. At 2:42 p.m., Deputy Braden stopped the Celica and approached the driver, whom he recognized as Rebecca Hill. At the window of the car, he also recognized the front passenger James Robinson and the rear passenger James Coker. Deputy Braden knew all three occupants of the car had prior arrests for burglary or theft. Deputy Braden saw a big screen television on the backseat beside Coker. When Deputy Braden asked the occupants of the car about the television, Robinson told him that the television belonged to Coker. Coker agreed and told Deputy Braden that he had broken up with his girlfriend, was moving out of their shared residence, and was taking his television. Deputy Braden thought the occupants of the car seemed nervous and evasive and felt that Coker had "stumbled over himself" when explaining that he was moving.

Deputy Braden immediately called for back up, and a K-9 officer Deputy Rick Coley arrived at 2:47 p.m. Deputy Coley walked his drug detection dog around the Celica and told Deputy

8

Braden that the dog had alerted on the car. Deputy Braden then relayed this information to Hill. Hill told him that marijuana had been smoked in the car the day before but that no drugs were in the car now. Deputy Braden asked for Hill's consent to search the Celica, and she agreed that the officers could search the car. Deputy Braden had the occupants get out of the car and advised them of the Miranda warnings. All three told Deputy Braden that they understood the warnings. Deputy Braden also checked on whether the occupants of the car had any outstanding warrants and learned that they had none in Anderson, Knox, or Union Counties.

At 2:50 p.m., Deputy Coley began searching the car. After checking for outstanding warrants, Deputy Braden assisted in the search of the car and found a pair of black gloves in the glove box and a single earring in the back floorboard. The search took twenty to twenty-five minutes and was completed by 3:15 p.m. Deputy Braden remained suspicious that the television was stolen because he doubted Coker's explanation that he was moving when there were no other clothes or belongings of Coker's in the car. Deputy Braden attempted to confirm Coker's explanation by calling Coker's ex-girlfriend but was not able to reach her. Deputy Braden called the dispatcher and reported the serial number of the television in the Celica, but around 3:21 p.m., the dispatcher responded that there had been no report of a television with that serial number having been stolen.

Between 3:18 and 3:20 p.m., Deputy Braden received a radio call about a residential burglary at nearby Hinds Creek Road. Deputy Braden immediately called the dispatcher and learned that an RCA television, guns, and jewelry were reported as stolen in the burglary. Between 3:27 and 3:30 p.m., Deputy Braden spoke to Deputy Relford, who had responded to the Hinds Creek residence, and got the serial number for the stolen television. Around 3:35 p.m., Deputy Braden confirmed that this serial number matched that of the television in the Celica and then arrested

9

Robinson and Coker. Hill subsequently told Deputy Braden that she knew where the stolen guns were and led him to the guns at her mother's residence.

### IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Robinson contends that he and the other occupants of the Celica were illegally detained beyond the time needed to complete the traffic stop and to search the car. First, he argues that the twenty to twenty-five minutes search of the car was unreasonably prolonged, given the small size of the vehicle and the level of detail in the search. Second, he maintains that upon the completion of the search, which yielded no incriminating evidence or contraband, the officers had no basis to continue to detain the car's occupants. He asserts that the statements of the other occupants of the car and any evidence ultimately discovered from those statements are the fruit of this illegal detention and must be suppressed.

The Defendant does not contest that Deputy Braden properly stopped the Celica for speeding. The Court observes that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." Terry v. Ohio, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the

10

stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999).

In the instant case, upon stopping the Celica speeding through an area plagued by recent residential burglaries, Deputy Braden recognized the Celica's occupants as having prior arrests for burglary and saw a big screen television on the backseat. At this point, Deputy Braden's suspicions were aroused, and he asked about the television. Although Coker claimed the television was his, Deputy Braden characterized the car's occupants as nervous and evasive and said that the Defendant's hands were shaking. "During a valid traffic stop, police officers may ask extraneous questions unrelated to the purpose of the stop, 'so long as those inquiries do not measurably extend the duration of the stop.'" United States v. Kenneth Kevin Cochrane, No. 11-4081 & -4082, 2012 WL 6621131, *3 (6th Cir. Dec. 20, 2012) (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)). The Court finds that Deputy Braden's initial questions about the television did not extend the duration of the traffic stop.

The Court also finds that the arrival of Deputy Coley and his leading his drug detection dog around the car, which occurred within three minutes of the stop, did not unreasonably extend the traffic stop. See United States v. Stepp, 680 F.3d 651, 663 (6th Cir. 2012) (observing that a dog sniff of a vehicle legally seized does not require separate reasonable suspicion and is analyzed in the same way as extraneous questions); United States v. Stubblefield, 682 F.3d 502, 505 (6th Cir. 2012) (holding that deployment and alert by drug dog within five minutes of traffic stop and while officer was in process of issuing citation did not improperly prolong traffic stop). Once the drug dog alerted on the car, the officer ostensibly had probable cause to search the car for drugs. "An alert by a properly trained and reliable drug-detection dog 'is sufficient to establish probable cause for the

11

presence of a controlled substance.'" Id. (quoting United States v. Diaz, 25 F.3d 392, 394 (6th Cir.1994)). At the suppression hearing, the Government did not present any evidence on the reliability and training of this drug dog, but the Court finds that the warrantless search of the Celica did not violate the Fourth Amendment because the Celica's driver voluntarily consented to a search of the car. The Defendant does not contest Hill's consent or the propriety of the search. Instead, the Defendant argues that the search itself was unreasonably prolonged given the size of the car and the fact that the search did not involve removing the seats, carpet, or spare tire.

Deputy Braden testified that the search of the car took twenty to twenty-five minutes. During cross-examination, Deputy Braden testified that the trunk of the car was searched as well as the passenger compartment but that he did not recall the officers removing the seats in the passenger compartment or removing the carpeting in the trunk. He said that the officers found gloves in the glove box and an earring in the back floorboard. He acknowledged that the officers found nothing in the front seat or the console. The Court does not find that taking twenty minutes to search a compact car for drugs to be per se unreasonable. The officers were searching for a small item–drugs–and the meticulous nature of their search is revealed by the fact that they found an earring in the floorboard of the back seat. Moreover, from the testimony of Deputy Braden it appears that he and Deputy Coley were continuously searching or working on aspects of the traffic stop, such as talking with the dispatcher about whether the occupants had any outstanding warrants, from the time they began the search.

Even if the Court were to find that the twenty to twenty-five minute search of the Celica was unduly prolonged, the Court finds that Deputy Braden learned information during the search that gave him reasonable suspicion to detain the car's occupants in order to continue

12

investigating the possible theft of the television. The search of the car revealed that there were no clothes or other belongings of Coker's in the car. This caused Deputy Braden to doubt Coker's explanation that he was moving out from the residence he shared with his girlfriend. At this point, Deputy Braden had a reasonable suspicion that the television was stolen, based upon the following specific and articulable facts: The car was speeding, the area was one in which a number of residential burglaries had occurred recently, the occupants of the car had a history of arrests for burglary and theft, they also seemed nervous and evasive, and Coker claimed to have just broken up with his girlfriend and to be moving out of their shared residence but had no clothes or other personal belongings with him, other than a television.

Defendant Robinson also argues that even if the search of the Celica was not unreasonably prolonged, the officers had no basis to continue to detain him, Hill, and Coker after the search was completed and no contraband was found. The Court has already found that after searching the Celica, Deputy Braden had reasonable suspicion to believe that the occupants of the car had stolen the television. A Terry stop must be "limited in scope and duration[.]" Florida v. Royer, 460 U.S. 491, 500 (1983). To fulfill these requirements, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985); United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002)

13

(holding that an officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to either confirm or dispel the officer's suspicions).

After completing the search of the Celica, Deputy Braden then took steps reasonably calculated to either confirm or dispel his suspicion that the television was stolen. Deputy Braden reported the serial number of the television in the Celica to the dispatcher, who informed him that there was no report of a television with that serial number having been stolen. Deputy Braden also attempted to call Coker's ex-girlfriend to confirm his explanation. While still waiting to hear back from Coker's girlfriend and within five minutes of completing the search, Deputy Braden received the radio dispatch of a residential burglary at nearby Hinds Creek Road. He immediately called the dispatcher and learned that a television was reported stolen in the burglary. At this point, Deputy Braden had reasonable suspicion to continue to detain the occupants of the car the additional seven to nine minutes needed to learn the serial number of the stolen television.

Accordingly, the Court finds that Deputy Braden had reasonable suspicion to detain Robinson, Coker, and Hill at the time he completed the search and worked diligently to confirm or dispel this suspicion until he confirmed that the serial number of the television stolen from the Hinds Creek Road residence matched that of the television in the Celica. At that point, Deputy Braden had probable cause to arrest the Defendant. Accordingly, the Court finds no Fourth Amendment violation occurred in this case and recommends that the Defendant's suppression motion be denied. Because the Court finds that the Defendant was legally detained, there is no need to discuss the Defendant's argument that the statements of Hill and Coker and the guns were the fruit of an illegal detention or the Government's alternative position that the officers acted in good faith.

## V. CONCLUSION

The Court has considered the parties' briefs and arguments along with the relevant case law and finds no basis to suppress the evidence stemming from the April 20, 2012 stop and search of the car in which the Defendant was a passenger. Accordingly, the Court **RECOMMENDS** that the Defendant's Motion to Suppress [**Doc. 21**] be **DENIED**.[1]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).